Story, Justice,
 

 delivered the opinion of the court. — This is a writ of error to the circuit court for the district of Maryland, in which the defendant in error was the original plaintiff. The suit was an action for money had and received, brought under the following circumstances : The defend
 
 *380
 
 ants, Luke Tiernan
 
 &
 
 Sons, of Baltimore, were factors of Thomas H. Fletcher, of Nashville, in the state of Tennessee. In the course of then-business transactions, Fletcher became indebted to them, and to another house, in which Luke Tiernan was surviving partner, in a sum of money exceeding $9000. On the 8th of May 1819, Fletcher, through his agent, Jouett F. Fletcher, shipped, at New Orleans, eighty-one hogsheads of tobacco, on board of the brig Struggle, bound for Baltimore, consigned to Tiernan
 
 &
 
 Sons. The invoice and bill of lading were inclosed in a letter of advice to Tiernan & Sons, by the Struggle: In the invoice, it was stated, that the shipment was made by order of Thomas II. Fletclior, through his agent, Jouett F. Fletcher; and in the bill of lading, that it was for the account and risk of Thomas H. Fletcher, and consigned to Tiernan
 
 &
 
 Sons. The letter of advice was as follows :
 

 New Orleans, May 8th, 1819.
 

 Messrs. Luke Tiernan
 
 &
 
 Sons :
 

 Gentlemen: — Herewith we hand you invoice, bill of lading, eighty-one hogsheads of tobacco, for account of Thomas II. Fletcher, by order of Jouett F. Fletcher, which you will please receive and hold subject to the order of the latter. We are yours, &c., McNeill, Fisk
 
 &
 
 Rutherford,
 

 per
 
 Jacob Knapp.
 

 A short time before, there had been a like shipment of tobacco on account of Thomas II. Fletcher, to Tiernan & Sons, by the schooner Mary. The consignment by the Struggle arrived on the 7th of June 1819, sometime after that by the Mary had been received. Previous to the arrival of either * 1 of *these shipments, viz., on the 10th of April 1819, Thomas II.
 
 '
 
 Fletcher, at Nashville,' wrote a letter to Tiernan
 
 &
 
 Sons, inclosing another to his creditors at Baltimore, informing them of his embarrassments, in consequence of the failure of a house at Nashville, and offering- a proposition for the liquidation of their debts. The letter, among other things, stated that his cotton and tobacco at New Orleans had all been shipped, and advances had on it, and that he had received the money arising from the sales and shipments; that he held a large amount of good paper, of the most unquestionable kind, the greater part of which was then due; that he offered to give paper of this description for their claims against him. He then proposed, that the creditors should appoint Mr. Ephraim H. Foster, of Nashville, their agent, to negotiate the business ; and added, “ in all eases such of you as hold my notes must forward them to Mr. Foster, as they must be taken up, when I give him other paper.” Tiernan
 
 &
 
 Sons, on the same day they received the letter, accepted the proposition, and wrote a letter to that effect. In consequence of this arrangement, Thomas II. Fletcher, on the 21s1 of May 1819, paid to Foster, in promissory notes, the claims of the two houses of the Tiernans, and took receipts in full from Foster, as agent. At the time of this payment and settlement, Tiernan & Sons did not know of the consignment by the Struggle; but Charles Tiernan arrived at Nashville shortly afterwards, and expressed his satisfaction at the mode of payment. At a subsequent period, in July 1819, this payment and settlement were rescinded by the parties, and the receipts given up. But in our view of the case, it is unnecessary to trace these transactions further.
 

 
 *381
 
 On the 21st of May 1819, Thomas H. Fletcher, being indebted to James Jackson, of Nashville (the plaintiff), drew a bill of exchange in his favor upon Tiernan and Sons, as follows :
 

 “Nashville, May 21st, 1819.
 

 $2400. Sixty days after sight of this my first of exchange (second unpaid), pay to the order of James Jackson, twenty-four hundred dollars, value received. Thomas H. Fletcher.
 

 To Messrs. Luke Tiernan & Sons, Baltimore.”
 

 This bill was presented, and protested for non-acceptance, on the 9th of June 1819 ; and was, at maturity, protested for non-payment. On the same day the bill Uvas drawn, Fletcher drew the following assignment on ¡-*5q4 the back of a duplicate invoice of the shipment by the Struggle. ~
 

 “Nashville, 21st of May 1819.
 

 I assign to James Jackson so much of the proceeds of the sale of the tobacco alluded to in the within invoice, as will amount to $2400 ; to Ingram
 
 &
 
 Lloyd, as above, $600 ; and the balance, whatever it may be, to G. G. Washington & Co.: and Messrs. Tiernan & Sons will hold the net proceeds of the within invoice subject to the order of the persons above named, as directed above. Thomas H. Fletcher.”
 

 This assignment was not delivered to Jackson until the 26th of the same month ; and all persons named therein were creditors of Fletcher. There are many other facts spread upon the record, but these appear to us all that are material to dispose of the questions argued at the bar.
 

 The first question is, whether the assignment so made to Jackson, on the 19th of May, passed the legal title in the tobacco, so as to make the same, or the proceeds thereof, presently the property of Jackson and the other persons named. This is a question essentially depending upon the intention of the parties, to be gathered from the terms of the assignment; for whatever may be the inaccuracy of expression, or the inaptness of the words used, in a legal view, if the intention to pass the legal title can be clearly discerned, the court will give effect to it, and construe the words accordingly. Thus, if a man grant the profits of his land, it is said, that the land itself passes. Co. Litt. 4 ; Com. Dig. Grant, E. 5. At the time when this assignment was made, the tobacco was
 
 in transit'd;
 
 and if there had been an absolute assignment of the proceeds, so that the tobacco was immediately put at the risk of the assignee, and the assignor was to have no further control over the management of it, we do not mean to say, that it would not pass the legal title and property in it to the assignee. But can such an intention be gathered from the words used in this instrument ? We think not. The words are, “ I assign, <fcc., so much of the proceeds of the sale of the tobacco, &c., as will amount to $2400.” The parties, then, contemplate a sale, and the assignment is to be, not of the tobacco itself presently, but of a portion of the funds arising from the sale of it, at a future period. „ Could the assignee or assignees have countermanded the consignment *■ to Tiernan
 
 &
 
 Sons ? Or, putting aside the factor’s claim of a lien, could they have demanded the property of the factors, before the sale? We
 
 *382
 
 think such was not the intention of the parties. The claim of Jackson was not to an undivided portion of the property, but to a specific amount of the proceeds arising from a sale. Suppose, before sale, the tobacco had been lost or destroyed, would the loss have been his or Fletcher’s? We think, it would have been Fletcher’s. The assignees were all creditors ; and there is no evidence, that they took the assignment in satisfaction of their debts, or otherwise than as security therefor. And the fact, that, contemporaneously, Jackson took a bill of exchange on Tiernan & Sons for the same amount, demonstrates, that he did not understand the assignment as extinguishing his debt, or as operating more than as collateral security. Upon the dishonor of that bill, he had a right of recourse against the drawer. In this view of the transaction, Fletcher had an immediate interest in the sale. The larger the amount of the proceeds, the further they would go to extinguish his antecedent debts. It is perfectly consistent with the terms of the instrument, that he should retain the legal title in the tobacco, and that his factors would have a right to make sale thereof, in the best manner they could, for his benefit, giving the assignees an equitable title in the proceeds of the sale. Our opinion is, that upon the terms of the assignment, it was not intended by the parties to pass the legal title in the tobacco, or its proceeds ; but to create an equitable title or interest only in the proceeds, after sale, for the benefit of the assignees.
 

 Assuming, then, that an equitable title only to the proceeds of the sale, amounting to $2400, vested by the assignment in Jackson, still, if there has been any agreement on the part of Tiernan
 
 &
 
 Sons to hold so much of the proceeds, for the benefit of Jackson, he may maintain the present action ; for under such circumstances, upon the receipt of the proceeds after the sale, so much thereof would be money had and received to the use of Jackson ; and it will make no difference, under such circumstances, whether Tiernan
 
 & x
 
 , Sons have a lien for any balance of accounts or not; for such *an -* agreement will bind them, and amount to a waiver of their lien
 
 pro tanto
 
 in favor of Jackson.
 

 The question, then, is, whether there are any ingredients in this case furnishing sufficient proofs of such an agreement ? Such an agreement may be express, or it may be implied, if the circumstances of the case, coupled with the acts of the parties, necessarily lead to such a conclusion. That there has been an express agreement on the part of Tiernan & Sons is not pretended. On the contrary, having received the shipment on the 7th of June 1819, they attached the property by a writ of garnishment, on the 8th of the same month, on their own account, as the property of Fletcher ; and they dishonored the bill drawn in favor of Jackson, on the succeeding day ; nor did they, after the notice of the assignment, on the 15th of the same month, ever give any express assent to hold the proceeds according to the terms of it.
 

 But it has been argued, that the receipt of the consignment, with the bill of lading, invoice, and letter of advice, amounted to an implied engagement to conform to the terms of the latter, and
 
 “
 
 to receive and hold the tobacco subject to the order of ” Jouett F. Fletcher, the agent of Thomas PI. Fletcher; and that it being the case of a mere agency, it is, in contemplation of law, subject to the direct order of the latter, without the intervention of his agent. Now, assuming that a factor, upon receiving a consignment,
 
 *383
 
 is bound, as between himself and his principal, to conform to the orders a? the latter, which cannot well be denied in point of law, the question still recurs, whether that implied obligation can inure to the benefit of a third person, so as to entitle the latter, upon obtaining an order at a future period, to maintain an action against the factor, as upon an agreement in his favor ? And,
 
 á fortiori,
 
 whether, in case of a dissent or refusal, contemporaneous with the receipt of the consignment, such an implied obligation can supersede the legal effect of such dissent or refusal ? If an assent is to be implied from the duty of the factor, in ordinary cases, may not his dissent be shown by acts rebutting the presumption ? In the present case, the letter of advice contains no authority to sell, but only to receive and hold the tobacco subject to the order of the party. If a power to sell be implied, it must be ^implied from the antecedent course of business and relation of the parties, as principal and factors. The implied obligation, then, from *- the receipt of the consignment, is no more than the terms of it express, viz., to receive and hold the tobacco subject to order ; not to pay over the proceeds to order. But waiving this consideration, how stands the general proposition in point of principle and authority ?
 

 The general principle of law is, that
 
 dioses in action
 
 are not at law assignable. But, if assigned, and the debtor promise to pay the debt to the assignee, the latter may maintain an action for the amount, against the debtor, as money received to his use. Independently of such promise, there is no pretence, that an action can be sustained. Have Tierman
 
 &
 
 Sons,
 
 sino
 
 notice of the present assignment, made any such promise to Jackson? Nt express promise is shown ; and the acts antecedently done by Tierman
 
 &
 
 Sons repudiate the notion of any intentional implied promise ; for those acts appropriate the property to their own claims, and to meet their own lien.
 

 But it is said, that if a party agrees to hold money or goods, subject to the order of the owner, it raises an implied promise to the holder of the order, upon which he may maintain an action at law. The case of
 
 Weston
 
 v.
 
 Barker,
 
 12 Johns. 276, has been relied on for this purpose. But in that ease, the party receiving the money under the assignment, made an express promise to hold the same, subject, in the first place, to the demands of certain specified creditors, and next, the balance, subject to the order of the assignor. The court held, that in such case, the holder of the order subsequently drawn had a right to the money, as money had and received to his use ; notwithstanding, there was a counter-claim, or set-off, of the assignee, accruing before the assignment. The case of
 
 Walker
 
 v.
 
 Birch,
 
 6 T. R. 258, is somewhat complicated in its circumstances, but it turned upon similar principles. There, the agreement was express, to hold the property for a particular purpose ; and that, in the opinion of the court, excluded-the right of the factor to assert a lien upon it, for any demand due to him, which was inconsistent with that purpose. Lord Kenyon there said, the parties may, if they please, introduce into their contract an article to prevent the application of a ^'general rule of law to it. In the note given by the factors in that case, they acknowledged, that they had ° received the goods for sale, and promised to pay the proceeds of them, when sold, to J. F. or his order. J. F. was the agent of the owners ; and they having become bankrupt, their assignees brought an action, not for the proceeds (for the goods were not sold), but for the goods, and they
 
 *384
 
 recovered, upon the footing of the original special contract. That case also differs from, the present in one important fact, and that is, that the suit was brought by the assignees of the bankrupt owners, and not by a holder o:f the order. In the case of
 
 Mandeville
 
 v.
 
 Welch,
 
 5 Wheat. 277, 286, it was said by this court, that in cases where an order is drawn for the whole of a particular fund, it amounts to an equitable assignment of that fund, and after notice to the drawee, if binds the fund in his hands. But where the order is drawn either on a general or a particular fund, for a part only, it does not amount to an assignment of that part, or give a lien as against the drawee, unless he consent to the appropriation, by an acceptance of the draft, or an obligation to accept may be fairly implied from the custom of trade, in the course of business between the parties, as a part of their contract. The court were there speaking in a case, where the suit was not brought by the assignee, but in the name of the original assignor, foi his use, against the debtor ; and it was, therefore, unnecessary to consider, whether the remedy, if any, for the assignee, was at law, or in equity
 

 The case of
 
 Farmer
 
 v.
 
 Russell,
 
 1 Bos.
 
 &
 
 Pul. 295, so far as the point before us is concerned, asserts the principle, that if A. receives money from B., to pay to 0., it is money had and received for the use of the latter. In such a ease, it is immaterial, whether the promise to pay over be express or implied ; for by the very act of receipt, the party holds it, not for A., but in trust for C. (See also
 
 Schermerhorn
 
 v.
 
 Vanderheyden,
 
 1 Johns. 139 ;
 
 Onion
 
 v.
 
 Paul,
 
 1 Har. & Johns. 114 ;
 
 Pigott
 
 v.
 
 Thompson,
 
 3 Bos.
 
 &
 
 Pul 146, 149, note.) The case of
 
 Neilson
 
 v.
 
 Blight,
 
 1 Johns. Cas. 295, resolved itself substantially into this : that the defendant, who was a sub-agent, had received the goods in question, upon condition of paying to the plaintiff out of the first proceeds, a certain sum due to him, according to a written * -Q-i contract with *the agent, of which he had notice, and to which, in a ■’ letter addressed to the plaintiff, he admitted his obligation to comply7 ; and the court held the plaintiff entitled to recover the amount, in an action for money had and received. This was, a case then, either of ;¡n express promise, by the sub-agent, or at least of an implied promise, irresistibly established, and creating a privity between the parties, in a manner clear and unequivocal.
 

 All these cases are distinguishable from the present. They are either cases, where there was an express promise to hold the money subject to th - order of the principal; or there was an implied promise to pay it over, as it was received, to the use of a particular person. The express promise to pay to order bound the party, and excluded any claim for alien, and any defence on account of want of privity between him and the holder of the order. The receipt of the money for the use of a particular person necessarily imported a promise or obligation to hold it in privity for such person. In the case at bar, no such irresistible presumptions exist. There was, as we have seen, no express promise to hold the proceeds of the sale subject to order ; and no implied promise, positively and necessarily, flowed from the circumstances. On the contrary, the acts of Tiernan
 
 &
 
 Sons, contemporaneous with the receipt of the consignment, negatived it; and the actual assignment was subsequent to those acts.
 

 The question is certainly a nice one ; and confessedly new m the circumstances of its actual presentation. On this account, we were desirous of
 
 *385
 
 making some further researches into the authorities ; and we have found two cases not cited at the bar, which seem to us fully in point. The first is
 
 Williams
 
 v.
 
 Everett,
 
 14 East 582. There, K., abroad, remitted certain bills to his bankers, in London, directing them to pay certain sums out of the proceeds, when paid, to certain specified creditors. The bankers received the bills, and before they were paid, the plaintiff (one of the specified creditors) called on the bankers, and stated, that he had received a letter from K., directing 300i. to be paid to him, out of the bills sent, and proposing to the bankers to indemnify them, if they would deliver to him one of the bills to the amount; but the bankers refused so to do, or to act upon the letter ; ■"although they admitted the receipt of it, and that the plaintiff was the person to whom the sum of 300i. was directed to be appropriated. *• The bankers afterwards received the money on the bills, and the plaintiff brought an action for money had and received, to recover the amount of the money so appropriated to him. The court held, that the action was not maintainable. Lord Exj.enborougix, in delivering the opinion of the court, said: “ The question which has been argued before us is, whether the defendants, by receiving this bill, did not_ accede to the purposes for which it was professedly remitted to them by K., and bind themselves so to apply it; and whether, therefore, the amount of such bill, paid to them, when due, did not instantly become, by operation of law, money had and received to the use of the several persons mentioned in K.’s letter, as the creditors in satisfaction of whose bills it was to be applied ; and of course, as to 300i. of it, money had and received to the use of the plaintiff. It will be observed, that there is no assent on the part of the defendants, to hold this money for the purposes mentioned in the letter ; but, on the contrary, an express refusal of the creditor so to do. If, in order to constitute a privity between the plaintiffs and defendants, as to the subject of this demand, an assent, express or implied, be necessary, the assent can, in this case, be only an implied one, and that too, implied against the express dissent of the parties to be charged. By the act of receiving the bill, the defendants agree to hold it, until paid ; and its contents, when paid, to the use of the remitter. It is competent to the remitter to give, and countermand, his own directions respecting the bill, as often as hi- pleases ; and the persons to whom the bill is remitted may still hold the bill, till received, and its amount, when received, for the use of the remitter himself ; until by some engagement entered into between themselves with the person, who is the object of the remittance, they have precluded themselves from so doing, and have appropriated the remittance to the use of such person. After such a circumstance, they cannot retract the consent they may have once given ; but are bound to hold it for the use of the appointee. If it be money had and received for the use of the plaintiff, under the orders, which accompanied the remittance, it occurs, as fit to be asked, when *did it become so ? It could not be so, before the money was received r*fim on the bill becoming due. And at that instant, suppose, the defend- *- ants had been robbed of the cash or notes, in which the bill in question had been paid, or they had been burnt or lost by accident; who would have borne the loss thus occasioned? Surely, the remitter, K., and not the plaintiff and his other creditors, in whose favor he had directed the application of the money, according to their several proportions, to be made. This appears to us to decide the question.”
 

 
 *386
 
 This language has been quoted at large, from its direct application to all the circumstances of the case at bar. Here, Tiernan
 
 &
 
 Sons, before the sale and receipt of the proceeds of the tobacco, refused to hold the same for the use of Jackson ; and how then could the money, when afterwards received, be money had and received to his use. If this case be law, it is in all its governing principles like the present. The case of
 
 Grant
 
 v. Austin, 3 Price 58, is still later, and recognises in the fullest manner the decision in 14 East 582. That was the case of a remittance to bankers, with a request, that they would pay certain amounts to persons specified in the letter. No dissent on the part of the bankers was shown. But the court held, that in order to constitute an appropriation of the money, or any portion of it, in favor of the persons specified, some assent on the part of the bankers must be shown : and that the circumstances of the case did not establish it. The remitter was, at the time, largely indebted to the bankei’S ; and the account between the parties was soon after broken up. It seems to us, that these authorities are founded in good sense and convenience. Until the parties receiving the consignment or remittance, had done some act recognising the appropriation of it to the particular purposes specified, and the persons claiming had signified their acceptance of it, so as to create a priority between them, the property and proceeds remained at the risk and on the account of the remitter or owner.
 

 In this view of the case, it is wholly immaterial to decide, whether Tiernan & Sons had a lien on the proceeds, or not, for the balance due them ; or whether the negotiations, stated in the record, created a dis-*602] ability on their part to assert it. :*For, even supposing that they have no available lien, that is a matter which cannot be litigated in a suit at law, where the only question is, whether the plaintiff has a good right to maintain his action ; whatever might be the case, in a suit in equity, brought by the plaintiff to enforce his equitable claims under his assignment.
 

 The instructions given by the court decided, that the assignment made to the plaintiff did, in effect, pass the legal property in the proceeds to the plaintiff, so as to entitle him to maintain the present action ; or, that at all events, it constituted such a special appropriation of them, as would enable the plaintiff, as assignee, to maintain it.
 
 We
 
 are of opinion, that the court erred upon both grounds ; and that, therefore, the judgment ought to be reversed, and the cause be remanded to the circuit court, with directions to award a
 
 venire facias ele novo.
 
 In the mandate, the errors in the bill of exceptions will be specially pointed, out; but as the principles involved in them are resolved into the points before stated, they need not here be particularly commented on.
 

 This cause came on to be heard, on the transcript of the record from the circuit court of the United States for the district of Maryland, and was argued by counsel: On consideration whereof, it is considered by the court here, that there was error in the circuit court in refusing to instruct the jury upon the prayer of the defendant’s counsel, that the assignment made by Thomas H. Fletcher, dated the 21st May 1819, and acknowledged and delivered on the 26th May 1819, and indorsed on the copy of the invoice, as stated in the evidence, did not pass such a legal title to any part of the pro
 
 *387
 
 ceeds of the tobacco shipped by the brig Struggle, tis will enable the plaintiff to support this action in his own name ; and in instructing the jury that such an assignment, connected with the character of the consignment of the cargo of the Struggle to the defendants, was sufficient to enable the plaintiff to support this action in his own name. And there was error also in the circuit court, in refusing to instruct the jury, that the invoice, letter of advice, and bill of leading, taken together, do *not constitute such a ri! special appropriation of the cargo of the brig Struggle, or of the proceeds thereof, to the order of Thomas H. Fletcher, as will enable his assignee in this case to maintain this action in his own name upon the assignment on May 21st, 1819. It is, therefore, considered by the court here, that for the errors aforesaid, the judgment of the circuit court be and the same is hereby reversed ; and that the cause be and the same is hereby remanded to the circuit court, with directions to award a
 
 venire facias de novo.